# ORIGINAL

Of Counsel
HIATT & HIATT

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

SEP 29 2011

at __4__ o'clock and __30__ min. __P__ M.
SUE BEITIA, CLERK

JERRY M. HIATT          2116-0
jh@hiattlaw.com
MAHILANI E.K. HIATT     6010-0
meh@hiattlaw.com
46-3976 Puʻaono Road
Honokaʻa, Hawaiʻi  96727
Phone:  808 885-3400
Fax:  877 775-1373

Attorneys for Plaintiffs Bogart
Mumford Parks, Individually and as
the Personal Representative of the
Estate of William J. Parks, Deceased,
and Chiya Nichole Parks

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BOGART MUMFORD PARKS, Individually and as the Personal Representative of the ESTATE OF WILLIAM J. PARKS, DECEASED, AND CHIYA NICHOLE PARKS, <br><br> Plaintiffs, <br><br> vs. <br><br> ROBERT R. WATKINS, M.D., HAMAKUA HEALTH CENTER, INC. dba KOHALA FAMILY HEALTH CENTER, AND UNITED STATES OF AMERICA, <br><br> Defendants. | CASE NO.  CV11  00594  RLP <br> (Federal Tort Claims Act) <br><br> COMPLAINT; EXHIBIT 1; DEMAND FOR JURY TRIAL; SUMMONS |

0276-001 Complaint 09.28.2011.doc

# COMPLAINT

## PARTIES

Comes now Plaintiffs Bogart Mumford Parks, Individually and as the Personal Representative of the Estate of William J. Parks, Deceased, and Chiya Nichole Parks  (together "Plaintiffs"), by and through their attorneys, Hiatt & Hiatt, and for their First Amended Complaint against Defendants Robert R. Watkins, M.D. ("Dr. Watkins"), Hamakua Health Center, Inc. dba Kohala Family Health Center ("KFHC"), and the United States of America ("USA")  (together "Defendants"), allege and aver as follows:

## JURISDICTION AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

1.      At all times relevant to this action, Plaintiffs Bogart Mumford Parks ("Bo") and Chiya Nichole Parks ("Chiya") and the decedent William J. Parks ("Mr. Parks") have resided within the County of Hawaii, State of Hawaii. Bo is the Personal Represenative of the Estate of William J. Parks in this matter. Bo files this action in his individual capacity and his capacity as Personal Representative of the estate of his father.

2.      At all times relevant to this action, Defendant Dr. Watkins was a resident of the County of Hawaii, State of Hawaii, and duly licensed to practice medicine in the State of Hawaii.

3.     At all times relevant to this action, Defendant KFHC was a clinic, with its principal place of business in the County of Hawaii, State of Hawaii.

4.     At all times relevant to this action KFHC was an approved delivery site of Hamakua Health Center, Inc., a federally supported health center and therefore covered under Federal Tort Claims Act ("FTCA").  This is confirmed by the letter dated September 29, 2010  attached as **Exhibit 1** hereto from the Department of Health and Human Services ("DHHS").

5.     This action arises under and Defendant USA is and should be a named Defendant pursuant to and under the provisions of the FTCA, 28 USC §1346(b), 2671, *et seq.*

6.     The injuries suffered by the Plaintiffs occurred in the County of Hawaii, State of Hawaii.

7.     At all relevant times, the KFHC personnel who participated in the injuries sustained by the Plaintiffs through their negligent acts and omissions were employed by Defendant USA, Department of Health & Human Services ("DHHS") and acting in the course and scope of their employment.

8.     Pursuant to the provisions of the FTCA, 28 USC §2871, *et seq.*, Plaintiffs filed claims for personal injury on March 21, 2011 against the USA,

through DHHS within the statutory period as required by law on March 21, 2011.

The USA acknowledged receipt of the FTCA forms on March 28, 2011.

9.     As of the filing of this complaint, the Plaintiffs have exhausted all required administrative procedures as to Defendant the United States Government and therefore, this suit is timely filed, pursuant to the provisions of the FTCA, 28 USC §2871, *et seq.* and 28 USC § 2675(a).

10.     This Court has supplemental jurisdiction over all remaining claims and parties pursuant to 28 USC §1367 a, because all of the remaining claims arise out of the same case or controversy.

## PROCEDURAL HISTORY

11.     Defendants are all health care providers as those terms are defined under the *Medical Claims Conciliation Act*, Chapter 671, Hawaii Revised Statutes, as amended.  The Plaintiffs have completed the Medical Claims Conciliation process and have a right to file suit in this matter.

12.     The claims against KFHC were also submitted to the MCCP, but KFHC refused to participate in the state MCCP proceeding contending that, as a federally supported health center it was not subject to state law jurisdiction and could only be sued under the Federal Tort Claims Act ("FTCA") in Federal court. They stated in relevant part that "The Hamakua Health Center, Inc., was deemed eligible for FTCA coverage on January 1, 2006, and that its coverage has

continued without interruption since that time. The Hamakua Health Center, Inc.,
assumed the operations of Kohala Family Health Center located at 53-3925 Akona
Pule Highway, Kapa'au, Hawaii 96755, effective August 10, 2006." Accordingly
the acts, omissions and procedures done here in June, 2007 were done at a time
when Hamakua Health Center, Inc. was responsible for the services provided by its
dba Kohala Family Health Center.

**COUNT I**
(Negligence and Medical Malpractice Against Dr. Watkins, KFHC, and USA)

13.     As set forth in detail below, Dr. Watkins and KFHC failed to
properly and timely diagnose, treat, refer and creae proper medical records for Mr.
William J. Parks' ("Mr. Parks") melanoma (referred to herein as "Melanoma")
from at least June 2007 until Mr. Parks' death two years later on July 22, 2009.

14.     Dr. Watkins rendered services to Mr. Parks in a manner and
under conditions that caused Mr. Parks reasonably to believe that the services were
being rendered by KFHC and/or its employees. Accordingly, KFHC is liable for
the negligent acts and omissions of Dr. Watkins in the same manner and to the
same extent as if those acts and omissions had been its own.

15.     Mr. Parks was born on January 1, 1948 and passed away on
July 22, 2009 from metastatic melanoma in the liver. He was only 61 years of age
at the time. From approximately 1970 to 1975, Mr. Parks was a highly regarded
professional football player in the National Football League. His position was

wide receiver.  At various times he played for the Dallas Cowboys, San Diego

Chargers, and the Houston Oilers.

16.   Dr. Watkins has been a North Kohala primary care physician

for over 30 years.  At the time of these events, Dr. Watkins has stated that he was

affiliated with the KFHC.  Dr. Watkins was also a personal friend of Mr. Parks and

he had served as Mr. Parks' primary care physician for approximately 20 years.

17.   As part of their friendship, Dr. Watkins and Mr. Parks traded

for their respective services to each other.  Mr. Parks, who was a skilled master

carpenter, performed carpentry services for Dr. Watkins at little or no cost for his

labor.  In exchange for this, Dr. Watkins was supposed to provide Mr. Parks with

complete medical care, the cost of which was to be funded out of Dr. Watkins'

own pocket.

18.   Mr. Parks had a history of extremely good health.  He was a

strong man, standing 6' 1" and normally weighing about 210 pounds.  He was an

active tennis player and in good physical shape prior the the events described

herein.

19.   However, both of Mr. Parks' parents died from cancer — his

father from jaw cancer and his mother from cervical cancer — and his brother also

had a form of bone cancer.  This family medical history should have been known

to Dr. Watkins and KFHC and should have alerted them both to be on the alert for any signs of cancer in Mr. Parks.

20.    In or about June, 2007, a little more than two years before Mr. Parks died from the Melanoma, he complained specifically to Dr. Watkins about a prominent, itchy mole on his left upper back.  He wanted Dr. Watkins to examine and treat it.  Dr. Watkins then came to Mr. Parks' home and Dr. Watkins decided to remove the mole himself at Mr. Parks home, rather than in a proper medical office and he decided to remove it himself, without first referring Mr. Parks to a dermatologist, or other specialist.  Had Dr. Watkins not examined and removed the mole at Mr. Parks' house, he would have done it at KFHC under proper medical procedures with proper assistants for the procedure, a proper medical record and a subsequent referral of the tissue he removed for a biopsy — which in turn would have alerted Mr. Parks to an early and curable cancer.

21.    During the removal procedure, Chiya entered the room.  She recalls clearly that she asked Dr. Watkins whether he intended to get the mole biopsied.  This was the procedure required by the standard of care.  Dr. Watkins chose not do so, apparently in order to save himself the money this would have cost him personally under his "trade" arrangement with Mr. Parks.

22.    In a separate conversation with Chiya, which took place a day or so afte the mole removal, Dr. Watkins was clearly angry with Chiya for raising

the issue of having the mole biopsied.  In that conversation, Dr. Watkins harshly

ordered Chiya never to question him in front of a patient again.

        23.     Thus, despite Chiya's specific request, Dr. Watkins failed to

have either the mole, or any of the tissue surrounding the mole, biopsied.

        24.     Plaintiffs are informed and believe that KFHC had an

agreement with Dr. Watkins at the time the mole was removed to maintain medical

records for Dr. Watkins' patients, which would have included Mr. Parks.

        25.     Dr. Watkins had kept absolutely no records of his care of Mr.

Parks throughout the previous years, and he kept no records of his advice to his

patient concerning Dr. Watkins' examination and removal of the mole, or any

record of any informed consent to the procedure, or any records of any informed

consent to the decision not to have the tissue biopsied, or any records of any

determination made about the possibility that Mr. Parks either had developed

cancer, or was at high risk for cancer.

        26.     Plaintiffs have sought to obtain Dr. Watkins' records as to the

treatment of Mr. Parks from him, KFHC, and others.  KFHC had no records.  The

only records Dr. Watkins was able to provide related to mid-2009, during the last

two months of Mr. Parks' life.  These consisted of his handwritten notes about

visits with Mr. Parks, as well as the various reports prepared by specialist

physicians.

27.     As a result of the failure to diagnose the Melanoma in June and July of 2007, the cancer progressed.  By May, 2009, Mr. Parks had become increasingly fatigued and suffered from severe pain.

28.     On May 5, 2009, Dr. Watkins' handwritten notes reflect that he called on Mr. Parks.  According to his notes, he examined Mr. Parks for a painful swelling in his left axilla, which had only been present for about a week.  Dr. Watkins' stated plan was to treat the swelling as an infection and to watch it closely.  He prescribed Septra, which is a drug that is used to treat or prevent infections that are proven or strongly suspected to be caused by bacteria.  Dr. Watkins was generally dismissive as to Mr. Parks' condition.  He did nothing to evaluate whether the swelling was caused by cancer from the Melanoma.  He provided Mr. Parks with pain medication.

29.     On May 26, 2009, Dr. Watkins wrote in his notes that Mr. Parks had not responded to the prescribed Septra.  After speaking with Dr. Anthony DeSalvo, Dr. Watkins informed Mr. Parks that a CT of the area was necessary.

30.     The CT was performed on June 1, 2009, and showed "extensive lymphadenopathy in the left axilla and adjacent supraclavicular region, nonspecific, but certainly suspicious for lymphoma or other metastatic disease."  In

addition, numerous mass lesions were seen in the liver, which also indicated the likelihood of metastatic cancer.

31.     On the same day, Dr. Watkins discussed his own conclusions that Mr. Parks had terminal cancer with Mr. Parks and his wife, Rebecca.

32.     On June 10, 2009, a needle bioposy was performed and that biopsy showed a poorly differentiated malignant neoplasm.

33.     In late June, Dr. DeSalvo referred Mr. Parks to Dr. Alistair Bairos for possible lymph node biopsy and for an evaluation for possible more substantive biopsy.  On June 30, 2009, Dr. Bairos issued his report with the diagnosis of amelanotic melanoma.

34.     Dr. Deen Wong informed Dr. Watkins of this diagnosis in a telephone call that day, and Dr. Watkins met with Mr. Parks and his wife, Rebecca to discuss the diagnosis later that evening.

35.     On July 6, 2009, Mr. Parks consulted with Dr. Desalvo.  As part of the consultation, Dr. Desalvo advised that Mr. Parks see a dermatologist.

36.     Shortly after the family received the news about Mr. Parks, Chiya had informed Bo about observing the removal of the mole and her request to Dr. Watkins that it be biopsied, and Dr. Watkins' refusal to do so, despite her request.

37.     On or about July 10, 2009, Dr. Watkins was at Mr. Parks' workshop. Bo saw him and asked him repeatedly and directly about the quality of the medical treatment which he had provided to Mr. Parks.

38.     At the beginning of that meeting, Dr. Watkins told Bo and Rebecca to sit down so that he could talk, and they complied.

39.     Dr. Watkins also sat down, crossed his legs and began to tell them in a somewhat detached manner about Mr. Parks' condition.

40.     Bo, who was understandably quite distraught about his father, demanded to know "what did you do?"

41.     Bo's direct question caused Dr. Watkins to break down and cry.

42.     Dr. Watkins then admitted to both Bo and Rebecca that, when he cut the mole from Mr. Parks' back, he had suspicions that it was cancerous, but did not follow up to test, or treat it.

43.     Bo then demanded to know how Dr. Watkins could have made the decision not to follow up, since such a suspicion would require a biopsy for confirmation.

44.     In response, Dr. Watkins replied "I know, I know, I should have had it done, but I already thought it was too late and I didn't want to tell your Dad and ruin his quality of life."

45.    Bo responded that such a decision was not Dr. Watkins' call to make and that he was obligated to inform Mr. Parks and his family and that he was simply not entitled to keep that kind of information to himself.

46.    Again, Dr. Watkins admitted, in front of Bo and Rebecca — "I know, I know, but I was hoping that I was wrong." Dr. Watkins also admitted that every time thereafter that Mr. Parks came to him with a complaint of aches or pains, in his own mind he was thinking, "Oh no, this can't be happening."

47.    Bo was dismayed to hear these statements and continued to question Dr. Watkins.

48.    Dr. Watkins then admitted that he had decided not to have a biopsy done on the mole.  When asked why not, he told Bo "yeah, the money, the money, the fucking money."

49.    This comment was a reference to, and an admission by, Dr. Watkins  that he was trying to save himself the small amount of money he would have otherwise incurred by not having the biopsy done on the mole because he would have paid for it personally under his arrangement with Mr. Parks.

50.    Dr. Watkins has a reputation in his own community of Kohala for being extremely reluctant to part with his money and his conduct on this occasion was consistent with this reputation.

51.    Dr. Watkins then continued crying, and he stated that he wanted to "kill myself" because of what he had done, which would shortly result in the death of his friend.

52.    During that same period of time, Dr. Watkins also admitted to Mr. Parks that Dr. Watkins believed he "had killed him" referring to Mr. Parks. Mr. Parks reported this clear admission by Dr. Watkins to him to other family members shortly before he passed away.

53.    Mr. Parks passed away on July 22, 2009 after an extensive period of pain, suffering and mental and emotional distress.

54.    On July 14, 2009, Dr. Stephen Smith reviewed the case.  He agreed with the diagnosis of malignant melanoma.  On July 15, 2009, Dr. Watkins went to Los Angeles for a five day trip and he returned to the Big Island shortly before Mr. Parks died.

55.    KFHC is responsible for the actions or omissions of Dr. Watkins under the doctrine of respondent superior.  KFHC is also responsible for the actions and omissions of Dr. Watkins because KFHC and Dr. Watkins are express or implied agents of each other and their actions and omissions are binding on each other.  KFHC is also responsible for the actions of Dr. Watkins because when the Hamakua Health Center, Inc. acquired KFHC it continued to use its

name, location and assets in a manner which led its patients and the public to

believe that Hamakua Health Center, Inc. and KFHC were the same entity.

      56.   Dr. Watkins and the KFHC (collectively "they") breached the

accepted standards of medical care in their treament and care of Mr. Parks by the

following conduct and omissions:

      a)   <u>Duty To Keep Records</u>.  Dr. Watkins and KFHC failed to

maintain complete records of their care of Mr. Parks.  Except for the last few

months of Mr. Parks' life, there are simply no records of the treatment and care

provided to him by Dr. Watkins, or KFHC over the period in which they cared for

him.

      b)   <u>Duty To Supervise Physicians</u>.  Dr. Watkins was

affiliated with KFHC for the reasons noted above.  KFHC had a duty to monitor

and supervise Dr. Watkins to ensure that he provided competent medical care to

Mr. Parks and KFHC breached that duty.

      c)   <u>Duty To Correctly Diagnose And Treat Any Sign Of</u>

<u>Melanoma</u>.  Both Dr. Watkins and the KFHC should have had the mole biopsied to

confirm, or rule out, any chance of melanoma — especially given Mr. Parks'

personal and family medical history.  If Dr. Watkins or KFHC were at all unsure,

they should have referred Mr. Parks to a dermatologist and/or an oncologist.  They

should have asked Mr. Parks about his symptoms and risk factors.  Dr. Watkins

was informed that the mole was itchy and irritated. These symptoms alone made the mole suspicious for melanoma. Dr. Watkins and KFHC should have inquired as to when Mr. Parks first saw the mole on his skin, and whether it has changed in size or the way it looked. They should also have asked about whether anyone in his family has had skin cancer and about all past UV light exposure. They should also have referred Mr. Parks to a dermatologist and/or oncologist.

d)   Exam Conditions. During the exam, and prior to the removal, Dr. Watkins and KFHC should have noted the size, shape, color, and texture of the area of concern, and whether there was any bleeding or scaling, itchiness or irritation. They should have employed a special magnifying lens and light source held near the skin and should have taken a picture of the spot. These tests, when used by a doctor who has experience with them, can improve the chances in finding melanomas early. They should also have checked the rest of Mr. Parks' body for other spots and moles, including the nearby lymph nodes. Enlarged lymph nodes can suggest the spread of a melanoma.

e)   Duty to Investigate Related Conditions. Dr. Watkins and KFHC also failed to investigate and discover the possible nexus among (a) Mr. Parks' history of pulmonary embolus, (b) his history of thrombophlebitis, and an irritant, potentially melanomic mole. The presence of the thrombophlebitis for four years in the lower extremity and the pulmonary embolus just four months

prior to the June 2007 mole removal were signs that there was a possible

malignancy due to a disturbance in the coagulation profile factors causing a

hypercoagulable state.  The failure to investigate this was also negligent and fell

below the standard of care.

       f)    <u>Duty To Obtain Informed Consent</u>.  Dr. Watkins and

KFHC had a duty to obtain informed consent from Mr. Parks as to the surgery on

the mole and the decision not to biopsy the mole.  Though Dr. Watkins admitted

that he knew Mr. Parks might have a melanoma, he deliberately chose not to

advise Mr. Parks of his conclusions, thereby denying Mr. Parks the right to seek

early surgery or other treatment, and the right to determine how Mr. Parks wished

to live.

       g)    <u>Duty To Refer</u>.  Dr. Watkins and the KFHC failed to

recognize when their medical services were not sufficient to provide proper care

for Mr. Parks and failed to refer Mr. Parks to a more competent professionals and

specialists, including a dermatologist and/or oncologist.

       h)    <u>Negligent Misrepresentation</u>.  The Hamakua Health

Center, Inc. assumed the name and location and assets and patients of KFHC and

thereafter represented that it was the same entity as KFHC.  To the extent it is a

different entity then it has engaged in negligent misrepresentations to the

Claimants, upon which they reasonably relied to their detriment and as a result of which they have substantial damages.

57.     As a direct and proximate result of each of these breaches of the applicable standards of care by each of the Defendants, as set forth above, Mr. Parks incurred medical expenses, suffered serious and permanent physical injuries, severe pain and suffering, severe emotional distress, loss of enjoyment of life, loss of consortium, loss of wages and benefits, and suffered other non-economic and economic losses.

58.     As a direct and proximate result of all of these breaches of the applicable standard of care, Bo and Chiya suffered severe emotional distress, loss of consortium and other non-economic and economic losses.

59.     Plaintiffs therefore are entitled to recover special and general damages from each of the Defendants in amounts to be shown at trial.

60.     Dr. Watkins' conduct and omissions were reckless, willful, wanton and/or made with a conscious indifference to consequences so as to entitle each of the Plaintiffs to an award of punitive damages against Dr. Watkins in an amount to be shown at trial.

Wherefore, Plaintiffs request that the Defendants be found liable, jointly and severally, to Plaintiffs as provided by law and that Plaintiffs be

awarded damages as to each of them in amounts to be shown at trial, plus their

costs of suit and such other and further relief as the Court deems just and proper.

Dated: Honoka'a, Hawai'i, _____September 28, 2011_____.

_____
JERRY M. HIATT
MAHILANI E.K. HIATT

Attorneys for Plaintiffs Bogart Mumford
Parks, Individually and as the Personal
Representative of the Estate of William J.
Parks, Deceased, and Chiya Nichole Parks